**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Priscila Manuela Brown,

Plaintiff,

Case No. 1:22-cv-2896-MLB

v.

SharkNinja Operating, LLC,

Defendant.

________________________________/

**OPINION & ORDER**

This is a products liability action before the Court on Defendant SharkNinja Operating, LLC's Motion to Exclude Expert Testimony (Dkt. 27) and Motion for Summary Judgment (Dkt. 28). For the reasons discussed below, the Court grants in part and denies in part Defendant's motions.

## I. Background[1]

Plaintiff Priscila Brown and her husband bought a Ninja BL640 blender from Walmart in 2017 or 2018. (Dkt. 37-1 ¶¶ 1–2.)[2] The blender contains a motor base, cup, and blade assembly. It looks like this:

(Dkt. 27-1 at 2.) Plaintiff bought the blender to make smoothies and soups. (Dkt. 37-1 ¶ 3.) She had never used a blender like this and did no

[1] The Court uses the parties' proposed facts and responses as follows. When a party does not dispute the other's fact, the Court accepts it for purposes of summary judgment and cites the proposed fact and corresponding response. When one side admits a proposed fact in part, the Court includes the undisputed part. When one side denies the other's proposed fact in whole or in part, the Court reviews the record and determines whether a factual dispute exists. If the denial lacks merit, the Court deems the fact admitted so long as the record citation supports it. If a fact is immaterial, it is excluded. If a fact is stated as an issue or

research before the purchase.  (Dkts. 37-1 ¶¶ 4–5, at 15–16.)  But she recalled the box had photos of smoothies and soups and said the blender was "good" for smoothies and soups.  (*Id.* ¶ 4, at 15–16; Dkt. 28-2 at 15.) She used the blender many times, sometimes daily.  (Dkt. 37-1 ¶¶ 6–7.)

---

legal conclusion, it is excluded.  *See* LR 56.1(B)(1)(c).  Where appropriate, the Court modifies one party's fact per the other's response when the latter better reflects the record.  Finally, as needed, the Court draws some facts directly from the record.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[2] Plaintiff's response to Defendant's Statement of Undisputed Facts violates the Court's Standing Order.  The Standing Order provides: "[A] party responding to a statement of material facts shall copy into its response document the numbered statement to which it is responding and provide its response to that statement immediately following." (Dkt. 3 ¶ r(2).)  Plaintiff did not do so.  (Dkt. 30 at 1–6.)  The Court admonishes Plaintiff for violating the Standing Order.  The rule is clear and should be followed.  In the light of this, any citation to facts is to Defendant's "Replies in Support of Statement of Undisputed Facts . . . and Objections and Responses to Plaintiff's Statement of Additional Disputed Facts," which contains all the parties' proposed facts, responses, and replies (where applicable). (Dkt. 37-1.)  Citations to paragraphs are to Defendant's facts, responses, and replies, and citations to page numbers are to Plaintiff's facts and responses.

Defendant did not intend for people to blend hot liquids and included that warning in several places. (*Id.* ¶¶ 11, 14.) The following warning appeared on the very first page of the Owner's Guide:

**IMPORTANT SAFETY INSTRUCTIONS**
**For Household Use Only**

**WHEN USING ELECTRICAL APPLIANCES, BASIC SAFETY PRECAUTIONS SHOULD ALWAYS BE FOLLOWED, INCLUDING THE FOLLOWING:**

**READ ALL INSTRUCTIONS BEFORE USING YOUR NUTRI NINJA® | NINJA® BLENDER DUO™ WITH AUTO-IQ™ TECHNOLOGY.**

**WARNING:**
**TO REDUCE THE RISK OF FIRE, ELECTRIC SHOCK OR INJURY:**

1 **CAUTION:** Blade assemblies are sharp and removable, handle with care. When handling the blade assemblies, always hold by the shaft.

2 **CAUTION: Do not blend hot liquids.**

( *Id.* ¶ 11.) This warning appeared again in later sections of the Owner's Guide. (*Id.* ¶ 12.) The warning "CAUTION: DO NOT BLEND HOT LIQUIDS" also appeared in three places on the blender, specifically on the motor base, the blade assembly/lid, and the 24-oz cup:

CAUTION: DO NOT BLEND HOT LIQUIDS – MISE EN GARDE: NE PAS MÉLANGER DE LIQUIDES CHAUDS
CAUTION: DO NOT BLEND HOT LIQUIDS
MISE EN GARDE: NE PAS MÉLANGER
DE LIQUIDES CHAUDS

(*Id.* ¶ 14.)  As visible in the photos, each of these warnings was in raised letters in the same color as the plastic piece.  Another warning on the motor base instructed users to read the product's instructions before use. (*Id.* ¶ 15.)

Plaintiff threw away the Owner's guide, instructions, and all packaging that came with the blender shortly after buying it.  (*Id.* ¶ 8.) She did not read the Owner's Guide before doing so.  (*Id.* ¶ 9.)  Plaintiff explained, "everybody know[s] how to use the blender[,] [and] [t]hat's the reason why [she] never pa[id] attention to it the minute [she] thr[ew] everything away."  (*Id.* ¶ 10.)  Plaintiff testified she did not see any warning on the blender telling her to be careful when using it.  (*Id.* ¶ 13; Dkt. 28-2 at 39.)   She did not notice the blender contained a black-on-black warning on the lid until she sent photos to her attorney for this case.  (Dkt. 28-2 at 39.)

On July 26, 2020, Plaintiff made a cream of broccoli soup she had made several times before.   (Dkt. 37-1 ¶ 16.)   She chopped broccoli, asparagus, onions, and peppers; heated five or six cups of water on her stove; and steamed the vegetables until soft.  (*Id.* ¶¶ 17–19.)  Leaving the pot on the stove, Plaintiff transferred the vegetables with a spoon from

the pot to her blender and added water from the faucet.[3] (*Id.* ¶ 20; Dkt. 28-2 at 19–20.) She put the lid on the blender, pressed the "puree" button, and walked away. (Dkts. 37-1 ¶¶ 21, 23; 28-2 at 21.) That button causes the blender to run for 35 seconds, but Plaintiff didn't pay attention to how long it ran. (Dkts. 37-1 ¶ 22; 28-2 at 21; 28-4 at 16.) When she returned, she twisted the top of the blender, saw some steam coming out, thought "it look[ed] like it [wa]s hot," and "left it there." (Dkts. 37-1 ¶ 24; 28-2 at 22–23.) Plaintiff testified that, when she was letting the steam out, the cup felt "normal" and "didn't feel hot." (Dkt. 37-1 at 19; 28-2 at 22–23.) Plaintiff went to the bathroom and came back. (Dkts. 37-1 ¶ 25; 28-2 at 23.) She twisted the lid of the blender again. (Dkt. 37-1 ¶ 26.) The contents of the blender expelled onto her and burned her. (*Id.*; Dkt. 30-1 at 41.) When asked whether she would have done something differently if she had known that blending hot liquids could cause excessive pressure and a risk of burns, Plaintiff testified "if [she] was able

[3] Plaintiff gave conflicting answers about where the water came from. At first, she testified she already had water on the counter. (Dkt. 28-2 at 20.) She later testified she could not recall whether the water came from the pot on the stove but that it "[p]robably was." (*Id.* at 21.) Defendant does not dispute Plaintiff's assertion that she got the water from the faucet, so the Court accepts that as well. (Dkt. 37-1 ¶ 20, at 19.)

to read the warning sign on the lid . . . [she] d[id]n't think [she] would [have] do[ne] that." (Dkt. 28-2 at 40.)

### A. Procedural History

Plaintiff brings claims against Defendant for failure to warn, design defect, marketing defect, and manufacturing defect. (Dkt. 1 ¶¶ 35–49.) She asserts these claims under both strict-liability and negligence. (*Id.*) She also brings claims for the implied warranties of fitness for a particular purpose and merchantability. (*Id.* ¶¶ 50–61.) Plaintiff submitted an expert report from Derek King about the adequacy of the warnings on the blender and alleged defects in its design. Defendant moves to exclude King's testimony and for summary judgment. (Dkts. 27, 28.)

## II. Motion to Exclude Expert Testimony

King holds a master's degree in electrical engineering from Ohio University and a bachelor's degree in mechanical engineering from University of California, Berkeley. (Dkt. 27-2 at 4.) Since 2009, he has worked as an engineer for Berkeley Engineering and Research ("BEAR") in the areas of failure analysis, design, and risk assessment of consumer and industrial equipment, including consumer blenders. (*Id.*) He

reviewed (among other things) Plaintiff's blender, other exemplar blenders, and Plaintiff's deposition transcript. (*Id.* at 5.) He provides seven opinions:

1. It is difficult, if not impossible, for a consumer to judge the pressure and heat inside of the unit without handling the cup and likely exposing themselves to danger;

2. BEAR has seen no evidence of a formal Failure Modes and Effects Analysis ("FMEA") or appropriate risk analysis conducted on Defendant's products;

3. There is no pressure relief device in place on the cup attachments;

4. There are systematic risk assessment methods, such as FMEA, that can be used to determine hazards early in the development of a product. With the hazards known early, designers have time to cost-effectively mitigate these hazards and defects, such as those in the Ninja BL640. Failing to follow the standard of care in engineering resulted in this Defendant's product reaching consumers with unnecessary hazards and defects;

5. The defective design of the Ninja blending cups allows for a potentially dangerous amount of heat and pressure to build-up inside of the cup. The pressure can easily be limited by a blowout plug or small spring-loaded pressure relief valve similar to what has been used in pressure cookers for decades. Another method of design of a gasket housing with a notch or hole which would allow the gasket to deform and leak at a specific pressure. This method of pressure relief has also been used in pressure cookers for decades and would not affect the cost of the product if implemented at the design stage;

6. Despite engineering alternatives available, Defendant chose to rely exclusively on warnings to inform users and alter their behavior to prevent unintended pressurization of the blender cup. This is among the least-preferred means of providing device safety; and

7. The warning regarding the risk of heating, pressurization, and spraying of contents is not visible unless the user is handling the potentially hazardous sealed container rather than being visible while resting in the blender. Additionally, the warning on the product is black on black with no contrast which violates good engineering practice and ANSI Z535.4.[4]

(*Id.* at 20–21.) Defendant moves to exclude several of these opinions as irrelevant and unreliable.[5] (Dkt. 27.)

### A. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert opinions:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the

---

[4] ANSI stands for the American National Standards Institute. It is a private company that, among other things, provides recommended standards for warnings.

[5] As part of this order, the Court denies Plaintiff's request for a hearing. (Dkt. 31 at 22.)

> testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court plays a "gatekeeping" role in the admission of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579, 597 (1993). "Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he [or she] intends to address; (2) the methodology by which the expert reaches his [or her] conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). These basic requirements can be described simply as qualification, reliability, and helpfulness. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

"The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005). The district court

must conduct a "rigorous inquiry" into each element to "ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Id.* at 1291. Ultimately, "the admission or exclusion of expert testimony is a matter within the sound discretion of the trial judge." *McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004).

**B. Discussion**

**1. Human-Factors Opinions**

Defendant says King's opinion that "[i]t is difficult, if not impossible, for a consumer to judge the pressure and heat inside of the unit without handling the cup and likely exposing themselves to danger" is not helpful or reliable and should be excluded.[6] (Dkts. 27-1 at 8–10; 27-2 at 20.)

**a. Helpfulness**

Expert evidence is helpful if it "concerns matters that are beyond the understanding of the average lay person" and is "relevant to the task at hand" by logically advancing a material aspect of the case. *Frazier*,

---

[6] As discussed below, Defendant characterizes King's opinion differently. The Court quotes from King's opinion.

387 F.3d at 1262; *McDowell*, 392 F.3d at 1298–99. Defendant argues King's opinion fails this standard because Plaintiff knew she was blending hot ingredients. (Dkt. 27-1 at 9–10.)

Plaintiff certainly knew she put ingredients directly from the stove into the blender. (Dkts. 37-1 ¶ 20; 28-2 at 19–20.) And she admitted that, after blending the ingredients, she twisted the lid and saw a little steam come out. (Dkts. 37-1 ¶ 24; 28-2 at 22–23.) But she also said the cup felt "normal" and "didn't feel hot." (Dkt. 37-1 at 19; 28-2 at 22–23.) Adding to that, she testified she let the cup sit while she went to the bathroom. (Dkts. 37-1 ¶ 25; 28-2 at 23.) It only expelled the hot contents when she opened it afterward. (Dkt. 37-1 ¶ 26.) That she knew the vegetables she put in the blender were hot does not necessarily mean she knew they were still hot when she finally opened the cup.

The bigger problem with Defendant's helpfulness attack is that it rests on Defendant's mischaracterization of King's opinion. Defendant says his opinion was "that ordinary consumers cannot judge whether the cup contains 'hot contents.'" (Dkt. 27-1 at 8.) And Defendant points out that its expert, Dr. Bryson Brewer, confirmed that the external surface of the cup would have felt hot to Plaintiff at all relative times. (*Id.* at 10.)

Ergo, Plaintiff could judge that the cup contained hot contents. But King didn't say consumers would not be able to tell whether the blender cup contains hot contents (if they, for example, put hot ingredients in it). He said it is difficult for a consumer to judge the pressure buildup inside the blender without handling it directly. He also explained that "to a lay person temperature build up may not indicate the risk of a pressurized cup." (Dkt. 27-2 at 6.) Defendant's expert does not suggest Plaintiff somehow knew the pressure had built up in the cup simply by feeling the heat. The Court cannot see how Dr. Brewer's opinion (that someone would know the cup is hot) renders King opinion (that someone would not know about internal pressure) unhelpful. King's opinion that it is difficult for an ordinary consumer to judge the pressure and heat inside the cup without handling it and likely exposing himself or herself to danger "logically advances a material aspect of the case"—that it was difficult for Plaintiff to do the same. *McDowell*, 392 F.3d at 1299.

**b. Reliability**

Defendant also says King's opinion is unreliable because his report "does not identify any facts supporting the notion that an ordinary consumer is unable to judge whether a clear plastic cup contains 'hot

contents.'"   (Dkt. 27-1 at 9.)   Again, that's not what King opined.

Defendant also says King identifies no temperatures an ordinary person

would perceive as hot or sufficient to create the risk that hot contents

might erupt.  (*Id.*)

Expert evidence is reliable if it is "supported by appropriate

validation—*i.e.*, good grounds, based on what is known."  *Frazier*, 387

F.3d at 1261; *see In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529

(6th Cir. 2008).  This means "[t]he trial judge in all cases of proffered

expert testimony must find that it is properly grounded, well-reasoned,

and not speculative before it can be admitted."  Fed. R. Evid. 702 advisory

committee's note (2000 amends.); *see Frazier*, 387 F.3d at 1262.  "This

entails a preliminary assessment of whether the reasoning or

methodology underlying the testimony is . . . valid and of whether that

reasoning or methodology properly can be applied to the facts in issue."

*Daubert*, 509 U.S. at 592–93.  "The focus . . . must be solely on principles

and methodology, not on the conclusions that they generate."  *Id.* at 595.

The Court finds King's opinion reliable.  King said his inspection

revealed the blender cup contained no pressure relief device.  (Dkt. 27-2

at 6.)  He also explained the cup has no other feature to warn a user that

the contents are under pressure, other than resistance when unscrewing the blade assembly or "potentially the temperature of the container to be felt by hand." (*Id.*) But—as the Court has said—he also explained that, to a layperson, this temperature buildup may not indicate the risk of a pressurized cup. (*Id.*) So, he concluded, "[t]here is no obvious way [for a user] to judge the danger of or amount of pressure and heat build-up without handling the cup directly." (*Id.*) Contrary to Defendant's argument, King's opinion is grounded in the lack of any pressure release device or pressure indicator. *Frazier*, 387 F.3d at 1261. And King's conclusion does not require identification of a specific temperature like Defendant suggests, as his opinion hinges on the hazard a user is unable to *perceive* until it's too late, not what temperature creates that hazard. King's opinion about the difficulty of judging the pressure inside the blender is admissible.

### 2. Design-Related Opinions

King proposes to offer an opinion that "normal use" of the blender can cause a pressurized ejection of hot contents. (Dkt. 27-2 at 8, 21.) King says he derived this opinion using the "thermodynamic concept"—that the buildup of heat in an enclosed area will lead to an

increase in pressure—and his conclusion that "the amount of energy added to the contents being blended is directly proportional to the time the motor is running." (*Id.* at 6, 8.) He explained the motor turns the blades, which then transfers energy to the food or liquid being blended. (*Id.* at 8.) Some of that energy is stored as "an increased temperature of the contents" thus causing the temperature in the blender to increase and resulting in thermal expansion—also known as pressure. (*Id.*) He explained the danger as follows:

> [T]he longer the time that the blender is running, the more energy is added to the contents. The more energy added, the higher the temperature. The higher the temperature, the higher the pressure. So, although a user may abide by the instructions to not use hot or carbonated ingredients, the blender is capable of pressurizing the contents through normal use.

(*Id.* ) He further explained the temperature can lead to dangerously high pressure:

> When the internal temperature and pressure of the cup exceeds the critical temperature/pressure, the cup/blade assembly will spontaneously 'explode.' Below the pressure for spontaneous explosion, a user who is actively attempting to remove the blade assembly from the cup may experience the sudden and unexpected release of pressure and ejection hot [sic] contents onto the user.

(*Id.*)

Defendant contends the Court should exclude King's opinion that "normal use" of the blender can cause the ejection of hot contents because: (1) King does not define "normal use," including whether such use includes blending hot liquids in violation of the warnings; (2) his report contains no facts or data identifying the time, temperature, or pressure necessary to create a hazard; and (3) his report overlooks the fact that the blender has a "lockout mode" that prevents anything from blending for more than 180 seconds, which Dr. Brewer concluded would not have been long enough to create dangerous pressure if Plaintiff had started with ingredients at room temperature.  (Dkt. 27-1 at 11–12.)

These issues are appropriate for cross-examination but do not render King's opinion inadmissible.  *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." (quoting *Hemmings v. Tidyman's Inc.*,

285 F.3d 1174, 1188 (9th Cir. 2002)). The Court concludes this for several reasons. First, King explained that "normal use" does not include blending hot liquids. Specifically, he explained, "*although a user may abide by the instructions to not use hot or carbonated ingredients*, the blender is capable of pressurizing the contents through **normal use**." (Dkt. 27-2 at 8 (emphasis added).) His analysis makes clear his opinion that pressurization can occur even when the user does not begin with hot or carbonated contents. That he did not otherwise include a precise definition for "normal use" goes to the weight of his testimony rather than its admissibility.

Second, King explained in detail how he arrived at his conclusion—using the thermodynamic concept. (*Id.* at 6, 8.) As with his failure to define "normal use," his failure to include specific facts about the "critical temperature/pressure" when a hazard occurs is a weakness in the underpinnings of his opinion and a topic best suited for cross-examination.

Third, while it appears King failed to consider a fundamental fact about the blender at issue—the lockout functionality—King says he inspected the blender. The Court thus cannot conclusively determine

that his opinion "fails to 'fit' with the facts of the case." (*Id.* at 5); *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1351 (M.D. Ga. 2007). King's failure to consider the lockout functionality may be a huge hole in his opinion; but that is a topic for cross-examination. Dr. Brewer's opinion on the lockout mode likewise goes to the weight of King's testimony rather than its admissibility. King's design-related opinions are admissible.

**3. Alternative-Design Opinions**

King explained that the most desirable method of controlling a risk is to "design out the hazard." (Dkt. 27-2 at 7.) He proposes a "small silicone blowout plug or other pressure relief device, like those used in pressure cookers." (*Id.*) Providing a photo, he explained that BEAR (the company at which he works) "developed and tested a pressure relief or blowout plug that can be used in NutriBullet cups" and that "this concept" is equally applicable to Defendant's blender cups. (*Id.* at 9.) King provided Defendant with an exemplar cup and silicone plugs for Dr. Brewer to test.[7] (Dkts. 31 at 19; 27-5 at 8–25.) King also proposes a

[7] King refers to the pressure relief valve and the blowout plug as two separate devices. (Dkt. 27-2 ("the pressure can easily be limited by a

third design: "a gasket housing with a notch or hole which would allow the gasket to deform and leak at a specific pressure." (Dkt. 27-2.) Defendant says the Court should exclude King's proposed "blowout plug" alternative design opinion because his report lacked sufficient detail about the proposed design.[8] (Dkt. 27-1 at 13.)

Georgia law provides a risk-utility analysis for design defect cases that balances "the risks inherent in a product design against the utility

---

blowout plug or a small spring-loaded pressure relief valve").) Both parties sometimes refer to them as one alternative design. (*See id.* at 9 ("BEAR developed and tested a pressure relief or blowout plug" and showing photo of one device); Dkt. 27-1 ("King proposes drilling a hole in the bottom of the cup and then placing a 'silicon[e] pressure relief valve' / 'blowout plug'").) The Court will not parse their discussions and treats the two devices as essentially the same.

[8] Defendant briefly argues the lack of detail also violates Federal Rule of Civil Procedure 26(a)(2)(B) and makes it "impossible" to evaluate reliability. (Dkt. 27-1 at 14.) The "purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify" to "minimize the expense of deposing experts, and to shorten direct examination and prevent an ambush at trial." *Companhia Energetica Potiguar v. Caterpillar Inc.*, 2016 WL 7507848, at *4 (S.D. Fla. Aug. 1, 2016) (citations omitted). Defendant did not depose King. And, as Plaintiff points out, King provided Defendant with an exemplar cup and silicone plugs for Dr. Brewer to test. (Dkts. 31 at 19; 27-5 at 8–25.) While King certainly could have provided more information about his alternative design, the Court does not agree that he made it "impossible" for Defendant to evaluate reliability. The Court finds no violation of Rule 26(a)(2)(B) here.

of the product so designed." *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 735 (Ga. 1994). The "existence of a safer alternative design is one of the factors that a jury may consider in determining whether a product has a defective design." *In re Cook Med., Inc., IVC Filters Mktg., Sales Pracs. and Prod. Liab. Litig.*, 431 F. Supp. 3d 1033, 1041 (S.D. Ind. 2020) (applying Georgia law and citing *Banks*). "Alternative safe design factors include: the feasibility of an alternative design; the availability of an effective substitute for the product which meets the same need but is safer; the financial cost of the improved design; and the adverse effects from the alternative." *Banks*, 264 Ga. at 736 n.6.

Defendant argues King did not test any of these alternative-design factors. (Dkt. 27-1 at 15.) As noted above, King stated BEAR "developed and tested a pressure relief or blowout plug" in the NutriBullet cups and that the concept would apply to Defendant's product. (Dkt. 27-2 at 9.) Admittedly, King does not provide any other details about this testing or explain why his alternative designs are equally applicable to Defendant's blender cups. But he said the design is feasible. Defendant can explore King's level of testing more on cross-examination.

Defendant next says King has not shown feasibility because he identifies no evidence that his proposed alternative design has ever been "commercially implemented" on any blender. (Dkt. 27-1 at 15–20.) Defendant explains that, although King asserts such pressure relief devices have been used in pressure cookers, he fails to identify a pressure cooker that has used one. (*Id.*) Defendant says this is fatal because "when an expert bases his alternative design conclusions on the existence of other products incorporating his proposed design, he must support those assertions by identifying those products, their manufacture[r]s, [and] the extent of their use . . . ." (*Id.* at 16 (citing *McGee v. Evenflo Co.*, 2003 WL 23350439 (M.D. Ga. Dec. 11, 2003).) Defendant's citation is not persuasive. The *McGee* court rejected an expert's identification of a proposed exemplar product because the product did not incorporate the very modifications the expert had suggested in his deposition. *McGee*, 2003 WL 23350439, at *8. King does not do that. He references a common pressure cooker's use of a silicone blowout plug, pressure relief valve, or gasket to prevent excessive pressure buildup. And again, he has explained the same device can be used on a blender cup. King has shown feasibility. *Banks*, 264 Ga. at 736.

Defendant says King's report was silent on the cost of the alternative design. (Dkt. 27-1 at 18.) The Court disagrees. King asserted the alternative design "would not affect the cost of the product if implemented at the design stage." (Dkt. 27-2 at 21.)

As part of its attack on King's expert opinion, Defendant contends King addressed no hazards created by his alternative design. (Dkt. 27-1 at 17.) That is true. (*See* Dkt. 27-2.) But King explained he could "design out" the hazard with a blowout plug or other pressure relief device. (*Id.* at 7.) In other words, he suggests pressurization (like the kind Plaintiff experienced) would not occur with his alternative design. His report says nothing further about any potential hazards. Maybe he thinks there are none. But "[o]bjections about [an expert's] failure to fully consider the risks and complications associated with the alternative designs are more appropriately considered an objection as to the weight of the evidence rather than as to its admissibility." *Arevalo v. Coloplast Corp.*, 2020 WL 3958505, at *4 (N.D. Fla. July 7, 2020).

Finally, Defendant contends King provides no analysis establishing whether and under what circumstances the proposed blowout plug would have prevented or reduced Plaintiff's risk of injury. (Dkt. 27-1 at 18.)

The Court disagrees. In his fifth opinion, he says Defendant's product is dangerous because it allows pressure to build up inside the cup and that "the pressure can he easily limited" with his alternative design. (Dkt. 27-2 at 21.) He says he tested the alternative design, and it would "design out" the hazard. (*Id.* at 7, 9.) King's opinion seems obvious: a pressure relief valve would relieve pressure before it reaches a dangerous level. Defendant may probe any weaknesses in the underpinnings of his conclusion through cross-examination. King's alternative-design opinions are admissible.

**4. Warnings-Related Opinions**

King opines that "[t]he warning regarding the risk of heating, pressurization, and spraying of contents is not visible unless the user is handling the potentially hazardous sealed container rather than being visible while resting in the blender." (*Id.* at 21.) He also says the warning on the product is black on black with no contrast, "which violates good engineering practice and ANSI Z535.4." (*Id.*) Defendant says the Court should exclude King's opinions about the presentation of the warnings

because he is not qualified to give that opinion.[9] (Dkt. 27-1 at 20–21.) The Court agrees.

King's professional background does not involve drafting consumer product warnings. Indeed, his resume does not mention that subject at all. (Dkt. 27-2 at 4, 22); *see Medina v. Louisville Ladder, Inc.*, 496 F. Supp. 2d 1324 (M.D. Fla. 2007) (finding that an expert witness in mechanical engineering was not qualified to render opinions on product warnings, where the subject of warnings was not even mentioned in his resume). Nor does it appear (at least that Plaintiff identifies) he has been qualified before as an expert regarding the adequacy of any specific warning.[10]

---

[9] Defendant does not otherwise challenge King's qualifications. King holds a bachelor's degree and a master's degree in engineering and has experience in the failure analysis, design, and risk assessment of blenders. (Dkt. 27-2 at 4.) King is thus qualified by "knowledge, skill, experience, training, or education" to provide testimony critiquing the design of the blender. *See* Fed. R. Evid. 702.

[10] The Court recognizes another court permitted King to testify that warnings on a blender showed a manufacturer was aware of the hazards at issue. (Dkt. 38); *Bettencourt v. SharkNinja Operating LLC*, 2024 WL 3187148, at *7 (N.D. Cal. June 25, 2024). But an opinion about a manufacturer's awareness is different than an opinion about the adequacy of the warnings.

Plaintiff admits King is not a warnings expert. (Dkt. 31 at 16.) She says, nevertheless, King applied an engineering analysis in explaining the role of Failure Modes and Effects Analysis, which necessarily refers to the product warnings. (*Id.* at 7–8, 16.) But Defendant does not challenge King's opinion about the use of FMEA in product design or that the engineering standard of care is to mitigate by design rather than by warning. Defendant narrowly challenges King's opinion that went a step further—his opinion about the adequacy of how the on-product warnings were presented, including the color, size, and placement of such warnings. (Dkt. 27-1 at 20–21.) Plaintiff has not demonstrated that a discussion about the FMEA or engineering standard of care (mitigating by design vs. including warnings) necessarily includes a discussion about the *adequacy* of those warnings or that King is qualified to opine on the color, size, and location of the warnings by nature of his expertise in mechanical engineering. Absent qualifications as a warnings expert, King cannot expand his qualifications on design issues into an opinion on

the adequacy of the warning merely by saying Defendant could have designed the warnings to stand out better.[11]

Plaintiff says federal courts allow "engineering experts to testify where their opinions are based on 'general experience and knowledge after a review of evidence.'" (Dkt. 31 at 17 (citing *Williams v. Tristar Prod., Inc.*, 418 F. Supp. 3d 1212 (M.D. Ga. 2019).) Plaintiff's citation to this case is also not persuasive. *Williams* used the quoted language in discussing whether an expert's testimony was reliable, not whether that

[11] Defendant does not appear to challenge King's discussion of ANSI standards generally. Defendant does argue, however, that there is no reliable foundation for King's assertion that the blender's on-product warnings do not comply with ANSI Z535.4. (Dkt. 27-1 at 21–22.) As discussed, King is not qualified to testify about the procedural adequacy of the warnings at issue. To the extent Defendant intended to challenge his ability to discuss what ANSI standards require generally, the Court finds King is qualified. But he must stop short of opining as to the adequacy of the warnings in this case. *Pulis v. Harbor Freight Tools USA, Inc.*, 2015 WL 10378848 (W.D. Ark. Jan. 23, 2015) ("Based on his general engineering experience and education, [the expert] may testify as to industry standards (i.e. ANSI, ASAE, OSHA, or other applicable standards), but must stop short of giving any opinion as to the adequacy of any warnings or safety information at issue in this case."); *see Schaaf v. Caterpillar, Inc.*, 286 F. Supp. 2d 1070 (D.N.D. 2003) (finding expert in design qualified to express opinions on "principles of the design process and the applicability of the relevant ANSI/ASAE Standards" but not qualified "to testify as to the adequacy of warnings," in part because the expert had "never designed a warning for the type of product at issue").

expert was qualified. *Williams*, 418 F. Supp. 3d at 1221. "Qualifications and reliability remain separate prongs of the *Daubert* inquiry that answer two separate questions." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 852 (11th Cir. 2021). King is not qualified to render opinions about the presentation of the warnings.[12]

## III. Motion for Summary Judgment

Defendant argues Plaintiff's claims—whether based on strict liability, negligence, or warranty theories—are subject to summary judgment. (Dkt. 28-8 at 3.) Plaintiff opposes.[13] (Dkt. 30.) The Court grants in part and denies in part Defendant's motion.

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute

---

[12] Since the Court finds King unqualified to render these opinions, the Court declines to address reliability and helpfulness.

[13] In Plaintiff's response brief, she concedes that summary judgment is proper on her claims for manufacturing defect and implied warranty of fitness for a particular purpose. (Dkt. 30 at 11 n.1.) Accordingly, the Court **GRANTS** Defendant summary judgment on those claims and does not discuss them further.

is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "showing—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325 (internal quotation marks omitted). In determining whether the moving party has met this burden, the district court must "view the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citation omitted). Once the moving party has adequately supported its motion, the non-movant then has the

burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine [dispute] for trial." *Id.* (citations omitted).

**B. Discussion**

As an initial matter, Plaintiff says the Court should deny summary judgment as to her negligence claim (Count II of her complaint) because Defendant failed to address it. (Dkt. 30 at 11–12.) The Court disagrees. Although Georgia recognizes causes of action for products liability sounding in both strict-liability and negligence, "[b]ecause of the inherent similarity between a negligence and a strict liability action under Georgia law, the analysis of [a] plaintiff's strict liability claims largely applies to an examination of the negligence claim." *Jones v. Amazing Prods., Inc.*, 231 F.Supp.2d 1228, 1251 (N.D. Ga. 2002). Defendant clearly addressed Plaintiff's claims under both theories. (Dkt. 28-8 at 3.)

### 1. Failure to Warn

Under Georgia law, a manufacturer can breach its duty to warn by: "(1) failing to adequately communicate the warning to the ultimate user or (2) failing to provide an adequate warning of the product's potential risks." *Wilson Foods Corp. v. Turner*, 218 Ga. App. 74, 75 (1995). The first type of failure-to-warn claim centers on issues such as location and presentation of the warning, while the latter focuses on the content of the warning, i.e., whether the warning informs the user of the relevant risks. *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1219 (11th Cir. 1999). In other words, the first type of failure-to-warn claim is based on the presentation of the warning, and the second is based on the substance. To prevail on either type of failure-to-warn claim, the plaintiff must show the defendant's failure to warn proximately caused the injury. *Wilson Foods Corp.*, 218 Ga. App. at 75.

Defendant argues Plaintiff is pursuing only the second type of failure-to-warn claim because her complaint "contains no allegations challenging the adequacy of the manner of communicating the warnings at issue." (Dkt. 28-8 at 13–14.) Defendant adds that the word "communicate" does not appear in her complaint. (*Id.* at 13.)

Plaintiff's complaint contains the following potentially relevant allegations: (1) "Defendant[] continue[s] to ignore and/or conceal its knowledge of these defects from the general public" (Dkt. 1 ¶¶ 32–33); (2) "Defendant failed to warn and place adequate warnings and instructions on the blenders" (*id.* ¶ 40(d)); (3) "Defendant failed to effectively warn or inform consumers of the unreasonably dangerous properties of the subject blender and methods by which consumers . . . could guard and/or mitigate such dangers" (*id.* ¶ 41); (4) "Defendant [] had a duty to adequately warn of dangers posed by a product's design" and "failed to exercise ordinary care in the . . . warnings" (*id.* ¶¶ 45–46); and (5) "Defendant was [] negligent in that it failed to give adequate or proper warnings or instructions" (*id.* ¶ 49).

Plaintiff's allegations are admittedly vague, and she did not clarify the matter by, for example, providing additional facts in her complaint related to the warnings. Plaintiff also never uses the word "communicate." But she alleged "Defendant failed to warn *and* place adequate warnings and instructions on the blenders." (*Id.* ¶ 40(d) (emphasis added).) This allegation—particularly the use of the word

"place"—suggests a challenge to both the presentation and substance of the warning.

Plaintiff's allegations also appear to have notified Defendant that she intended to raise both types of failure-to-warn claims. After all, Defendant challenged both types on the merits and does not suggest it was unprepared in any way.[14] The Court thus considers the appropriateness of summary judgment on both types of claims.

Plaintiff attacks the presentation of the warnings on the blender, arguing the raised lettering without color contrast is nearly unreadable. (Dkt. 30 at 17–18.) Defendant says, regardless of that, Plaintiff's contributory negligence in throwing away the Owner's Guide and failing to read the on-blender warnings was the proximate cause of her injuries, thus barring any claim. (Dkt. 28-8 at 15–20.) As support for this argument, Defendant relies on *Thornton v. E.I. Du Pont De Nemours &*

[14] Indeed, in February 2023, Plaintiff testified she never saw the warnings. (Dkt. 28-2 at 2, 39.) In May 2023, she designated her expert witnesses, including King, who she said, "may be called to testify regarding the adequacy of the warnings." (Dkt. 28-6 at 2.) King's report completed the same month discussed the color and placement of the warnings. (Dkt. 27-2 at 13–14.) The presentation of the warnings was at issue.

*Co.*, 22 F.3d 284 (11th Cir. 1994). In that case, the plaintiff applied a highly flammable lacquer thinner—intended only for use on automobiles—to a floor he was refinishing. 22 F.3d at 286. When he used a buffer on the thinner, he started a fire and suffered extensive burns. *Id.* He sued the manufacturer claiming the thinner had a design defect and inadequate warnings. *Id.* The lacquer can, however, had several statements that warned of a risk of fire or explosion, including one that read: "DANGER! EXTREMELY FLAMMABLE LIQUID AND VAPORS. VAPORS MAY CAUSE FLASH FIRE." *Id.* at 287. The plaintiff admitted he had used the lacquer several times but never bothered to read the warning. *Id.* at 286.

The Eleventh Circuit recognized "the general rule in Georgia . . . that the adequacy of the warning is an issue for the jury." *Id.* at 289. But, given the clarity of the warning and the fact the manufacturer marketed it only to professionals, the court concluded the warning was sufficient as a matter of law. *Id.* ("[I]n this case, the facts support only one conclusion, that is, the warning and its communication were adequate"). The court then concluded the plaintiff's admitted failure to read the warning despite his repeated use of the product

constituted contributory negligence that barred his products-liability claim. *Id.* at 290 ("[The plaintiff] was contributorily negligent by failing to read the warning, therefore, any insufficiency in the warning label is not the proximate cause of his injuries"). In doing so, the court distinguished its prior decision denying contributory negligence for failure to read warnings in *Rhodes v. Interstate Battery Sys. of Am., Inc.*, 722 F.2d 1517 (11th Cir. 1984). *Id.* The *Thornton* court explained the warnings in the prior case were not sufficient as a matter of law. *Id.* ("The court in *Rhodes* found that there was a factual issue as to the adequacy of the defendant's communication of the warning.").

This case is like *Rhodes*, not *Thornton*. The Court is aware of no case finding a warning consisting exclusively of raised letters in the same color as the product sufficient as a matter of law. Plaintiff testified she never saw the warnings on the blender until she sent pictures to her attorney, and the pictures confirm her description of the warnings. (Dkt. 28-2 at 39.) And Plaintiff had only one opportunity to read the Owner's Manual before she threw it away. This is not a case in which a plaintiff repeatedly chose not to read adequate warnings she knew were there. As a result, Plaintiff's failure to read any of the warnings does not,

as a matter of law, bar her failure-to-warn claim challenging the presentation of the warnings.[15]

As for the second type of failure-to-warn claim, Defendant says Plaintiff's admitted failure to read the Owner's Manual or on-blender warnings bars her claims. Specifically, it contends that—in the light of her admission—Plaintiff cannot show the substance of the warnings proximately caused her injuries. (Dkt. 28-8 at 12–15.) The Court agrees. *See Puckett v. The Plastics Grp., Inc.*, 2013 WL 11904721, at *10 (N.D. Ga. Jan. 17, 2013) (noting that plaintiff's admission that he did not read the warning barred recovery under the second type of failure-to-warn claim); *Reynolds v. Gen. Motors Corp.*, 2007 WL 2908564, *4 (N.D. Ga. Sept. 28, 2007) ("[W]ith regard to the second type of failure to warn claim, the plaintiff's failure to read a provided warning does bar recovery since the content of the warning would not be the proximate cause of the injuries suffered.").

---

[15] As Defendant has challenged whether Plaintiff adequately alleged this claim, the Court notes Defendant may object under Federal Rule of Civil Procedure 15(b)(1) if it thinks appropriate. Any objection must be raised by submission of the pre-trial order if mediation efforts are unsuccessful.

The Court grants Defendant summary judgment on Plaintiff's failure-to-warn claim related to the substance of the warnings. Plaintiff may move forward on her failure-to-warn claim only as to the presentation of the warnings on the blender base, lid, and cup.

**2. Design Defect**

Defendant says Plaintiff cannot establish her design-defect claim because she lacks admissible expert evidence on the risk-utility test and alternative design options necessary to support a such a claim. (Dkt. 28-8 at 21.) Plaintiff maintains that King's opinions are admissible. (Dkt. 30 at 20–21.) She adds that Defendant failed to address her marketing-defect claim—specifically, her allegations that Defendant "failed to properly market" the blenders and "[a]ggresively over-promoted and marketed" its blenders. (*Id.* at 13–14.) Defendant replies that a marketing-defect claim does not carry its own set of criteria but is a sub-set of a design-defect claim. (Dkt. 37 at 6.)

While a jury usually conducts the risk-utility analysis in a design-defect case, a plaintiff looking to avoid summary judgment "must produce evidence from an expert who is qualified to conduct the risk-utility analysis and to opine that the risks inherent in [the product]

design outweigh the utility or benefit derived from the product." *Bryant v. BGHA, Inc.*, 9 F. Supp. 3d 1374, 1384 (N.D. Ga. 2014) (citing *Dean v. Toyota Indus. Equip. Mfg., Inc.*, 540 S.E.2d 233, 237 (Ga. Ct. App. 2000)). Defendant's only argument in support of summary judgment hinged on the exclusion of King's opinions above. Because the Court has already ruled that testimony admissible, the Court denies summary judgment on Plaintiff's design-defect and marketing-defect claims.

**3. Implied Warranty of Merchantability**

In Georgia, a merchant impliedly warrants that goods "[a]re fit for the ordinary purposes for which such goods are used." O.C.G.A. § 11-2-314(2)(c). To recover, the plaintiff must show "not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained." O.C.G.A. § 11-2-314, UCC Comment 13. To prove breach, the plaintiff must show the goods had a latent defect at the time of sale that was not disclosed or discoverable by the exercise of caution on her part. *Willis Min., Inc. v. Noggle*, 235 Ga. App. 747, 749 (1998); *Smith v. Ne. Ga. Fair Ass'n*, 85 Ga. App. 32, 36 (1951).

Defendant says Plaintiff's claim for implied warranty of merchantability fails because she presented no evidence the blender contained a defect—latent or otherwise—at the time of sale that she could not have discovered through reasonable caution. (Dkt. 28-8 at 23–25.) Plaintiff argues the blender was not fit for the ordinary purpose for which blenders are used: blending soup. (Dkt. 30 at 23.) Plaintiff points out that she recalled the box said the blender was good for soup and that a "Frequently Asked Questions" page for the blender located on Defendant's website states, "[i]f you are making soup on a stovetop and blending to a smoother consistency, we recommend you let the ingredients cool before adding them to the blender pitcher." (Dkts. 31 at 23; 37-1 at 21.) Neither of these things instructs Plaintiff to blend hot liquids. Indeed, the website specifically recommends letting the ingredients cool *before* adding them to the blender. Defendant specifically disclosed that a consumer should not blend hot liquids.[16] (Dkt. 37-1 ¶¶ 11–12, 14–15); *Smith*, 85 Ga. App. at 36. Plaintiff identifies no authority suggesting a person who uses a product in a way the

[16] Whether Defendant's *efforts* to disclose were sufficient is a different inquiry discussed above.

manufacturer expressly says not to may nonetheless maintain a claim for breach of the implied warranty of merchantability. The Court grants Defendant summary judgment on Plaintiff's warranty claim.

## IV. Conclusion

The Court **GRANTS** in part and **DENIES** in part Defendant's Motion to Exclude Expert Testimony (Dkt. 27) as set forth in this Order. The Court **GRANTS** in part and **DENIES** in part Defendant's Motion for Summary Judgment (Dkt. 28). Plaintiff's failure to warn (based on Defendant's efforts to communicate the warnings), design defect, and marketing defect claims survive.

The Court **ORDERS** this case to mediation. The parties may retain a private mediator at their own expense. Or they may ask the Court to appoint a magistrate judge to conduct the mediation. The parties are not required to pay for mediation by a magistrate judge. The parties shall advise the Court of their mediation preference no later than 30 days after the date of this Order. If the parties elect to retain their own mediator, they shall identify the mediator no later than 45 days after the date of this Order. Mediation must occur within 90 days after the date of this Order. The parties must have present at the mediation a person with

authority to settle this litigation. The parties shall file a report on the outcome of their mediation no later than 7 days after the mediation concludes. The Court **STAYS** this case pending mediation. The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of the stay.

**SO ORDERED** this 20th day of September, 2024.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE